UNITED STATES DISTRICT COURT

DISTRICT COURT OF OREGON

REGENA M. BRIDGES,                                    3:11-cv-06046-AC

                              Plaintiff,              FINDINGS AND
                                                      RECOMMENDATION
        v.

MICHAEL ASTRUE, as
Commissioner of Social Security

                              Defendant.

_____

ACOSTA, Magistrate Judge:

*Findings and Recommendation*

Regena Marie Bridges ("Bridges") challenges the Commissioner of Social Security's (the

"Commissioner") decision denying her application for social security disability insurance ("DIB")

under Title II, 42 U.S.C. § 423(a)(1), of the Social Security Act (the "Act"), and supplemental

FINDINGS AND RECOMMENDATION        1                              {CKH}

security income benefits ("SSI") under Title XVI, 42 U.S.C. § 1382(a), (collectively "Benefits").

This court has jurisdiction under 42 U.S.C. § 405(g). In finding Bridges not disabled, as defined by

the Act, the ALJ concluded Bridges's testimony about her symptoms was less than credible but

failed to set out clear and convincing reasons for the decision. Accordingly, for the reasons set forth

below in more detail, the Commissioner's decision should be reversed and remanded for the award

of benefits.

*Procedural Background*

Bridges filed her applications for Benefits on October 24, 2007, alleging disability since

December 21, 2005, due to a combination of impairments, including, but not limited to, heart failure

and injuries from several car accidents. (Tr. 113, 117, 133.)[1]  Bridges's application was denied

initially and upon reconsideration. (Tr. 57-59, 64.) On September 14, 2009, after a timely request

for a hearing, Bridges appeared and testified before an administrative law judge ("ALJ"). (Tr. 29.)

Bridges was represented by counsel, Drew Johnson. Nancy Bloom, an impartial vocational expert

("VE"), also appeared and testified. (Tr. 29.)

On November 14, 2009, the ALJ issued a decision finding Bridges not disabled, as defined

by the Act. (Tr. 23.) Bridges filed a request for review of the ALJ's decision. (Tr. 4.) On

December 15, 2010, the Appeals Council denied Bridges's request for review of the ALJ's decision,

making it the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981 (2006) (an ALJ's

decision is binding if the Appeals Council denies a request for review and the claimant does not file

an action in federal district court). This appeal follows. (Docket # 15.)

---

[1]"Tr." refers to the official transcript of the administrative record. (Docket # 11.)

*Discussion*

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence from the record. 42 U.S.C. § 405(g) (2006); *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). The ALJ applied the five-step sequential process developed by the Commissioner for evaluating whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (DIB); *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989) (SSI). The ALJ resolved Bridges's claim at the fifth step of that process, determining Bridges retained the residual functional capacity ("RFC") to adjust to and perform jobs that exist in significant numbers in the national economy. (Tr. 22.)

A claimant's RFC represents the type of work activity the claimant can still perform. 20 C.F.R. §§ 404.1520(f), 416.920(f). In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (citation omitted); *accord* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The ALJ assessed Bridges's RFC as follows:

> Ms. Bridges has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: no overhead work; occasional pushing and pulling with the upper extremities; no climbing of ladders, ropes, scaffolds; occasional crawling; no other postural limitations; limited to one to three step tasks equivalent to entry-level unskilled work as outline in the Dictionary of Occupational Titles; and no general public contact.

(Tr. 15.)

Bridges asserts several challenges to the Commissioner's decision finding her not disabled. First, she contends the ALJ failed to identify clear and convincing reasons for rejecting her testimony. (Pl.'s Br. 14.) Second, Bridges contends the ALJ failed to give proper consideration to the opinions of Steven G. Athay, M.D. ("Dr. Athay"), and Lisa Lamoreaux, M.D. ("Dr. Lamoreaux"). (Pl.'s Br. 18.) Third, Bridges contends the ALJ omitted some of Bridges's limitations from the hypothetical posed to the VE. (Pl.'s Br. 20-21.)

The record establishes the ALJ properly considered the medical opinions and conclusions of Dr. Athay and Dr. Lamoreaux. The ALJ also committed no error in formulating the RFC. The court does find error, however, in the ALJ's failure to delineate specific, clear and convincing reasons to justify rejecting Bridges's testimony.

I.    Bridges's Testimony

Bridges testified she experienced pain throughout her body on a daily basis, which prevented her from doing "some of the simplest things." (Tr. 33.) She claimed her neck and shoulder areas were the most painful, but pain in her hips and legs made climbing stairs and walking difficult. (Tr. 33-34.) Specifically, Bridges testified she could walk for twenty minutes slowly before having to sit down. (Tr. 37.) She also testified she was able to sit for thirty minutes, depending on her ability to move around in the chair. (Tr. 37.) Bridges also reported she could lift and comfortably carry no more than one or two pounds. (Tr. 37.)

Bridges testified about experiencing numbness in her fingers. (Tr. 42.) "It's in my arms, my – both of my arms – all the way down to my fingers." (Tr. 42.) She claimed the numbness would wake her at night and she would need to shift her body around to bring feeling back to those

areas. (Tr. 42.) Bridges testified that both of her arms went numb but the loss of feeling was worse in her right side. (Tr. 42.) The numbness turned to pain when she moved her shoulder. (Tr. 42.)

Bridges reported this numbness restricted use of her hands. (Tr. 42.) She described being able to help her mother with cross-stitching "a little bit," but told the ALJ that movement involving either of her shoulders "really hurt." (Tr. 42.) If Bridges had to lift anything, she felt pain all the way up her shoulder and into her neck. (Tr. 42.)

When asked at the hearing whether she could handle her house work, Bridges testified: "What I can of it. . . . I try to do what I can." (Tr. 44.) Bridges reported her roommate does most of the house work and her son also helps in daily chores. (Tr. 44.) When she put dishes away, Bridges explained, she would use her left hand and put one dish in the cabinet at a time. (Tr. 45.) "It's no more being able to take a stack of plates and stick them up in the cupboard." (Tr. 45.) Bridges testified someone always accompanied her on trips to the grocery store – her friend or her son. (Tr. 44-45.) Sometimes, between activities, Bridges needs to lie down; sometimes, she needs to sleep for an hour or two. (Tr. 45.) Bridges testified she sleeps for the majority of the day at least one day each week. (Tr. 45.) "I have to be able to rest because I get very, very tired." (Tr. 38.)

Bridges testified at the hearing she disliked pain medication and tried not to take pills on a regular basis. (Tr. 46.) She explained, however, she took her Percocet daily "but the pain is bad enough that one I have found does not do, so I take two at a time. So, I can only take them twice during the day." (Tr. 46.) Bridges admitted to the ALJ she thought her Percocet prescription instructed her to take one pill every six hours and agreed that taking two Percocet at a time was not "as prescribed." (Tr. 47.) Bridges testified she did not take four Percocet pills every day – only as

she needed them. (Tr. 47.)  However, Bridges has not yet had Percocet pills left over at the end of

the month, and has run out of medication before the end of the month. (Tr. 47.)

When asked about her mental health, Bridges explained her medication, "Zelixa,"[2] helped

curb her depression. (Tr. 34-35.)  "When I'm not on medicine, I'm pretty depressed and in tears

most of the time." (Tr. 35.)  Bridges also testified she was not participating in mental health

counseling because she did not have money to pay for the services. (Tr. 34.)  Finally, Bridges

testified she used methamphetamine for the last time "probably about, maybe the summertime of

probably '06." (Tr. 44.)

The ALJ conducts a two-step analysis to assess subjective claimant testimony.  Under step

one, the claimant "must produce objective medical evidence of an underlying impairment" or

impairments that could reasonably be expected to produce some degree of symptom. *Tommasetti*

*v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281-82

(9th Cir. 1996)).  If a claimant meets this threshold, and there is no evidence of malingering, under

step two the ALJ may reject testimony about the severity of the claimant's symptoms only by

providing specific, clear, and convincing reasons for doing so. *Smolen*, 80 F.3d at 1281; *see also*

*Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) ("Unless there is affirmative evidence showing

that the claimant is malingering, the ALJ's reasons for rejecting pain testimony must be clear and

convincing.")

The ALJ may consider various factors in weighing a claimant's credibility, including:

(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for
lying, prior inconsistent statements concerning the symptoms, and other testimony

---

[2]The court assumes Bridges was referring to Celexa, which doctors prescribed her on several
occasions. (Tr. 486, 497, 520.)

by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

*Tommasetti*, 533 F.3d at 1039 (citations omitted). "Contradiction with medical record is a sufficient basis for rejecting the claimant's subjective testimony." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008) (citation omitted). The ALJ's overall credibility finding may be upheld even if all of the ALJ's reasons for rejecting the claimant's testimony are not supported by the record. *See Batson*, 359 F.3d at 1197.

At step two of the five-step disability analysis, the ALJ determined Bridges suffered from severe impairments -- cervical degenerative disc disease, obesity, right upper extremity impingement syndrome, and depression. (Tr. 12.) Despite the ALJ's determination at step three that those impairments, while severe, did not meet or medically equal listed impairments, the ALJ's finding of severity at step two satisfies Bridges's burden to produce objective medical evidence of an underlying impairment that could reasonably cause some degree of symptom. *See Tommasetti*, 533 F.3d at 1039. Further, the ALJ did not find evidence that Bridges malingered. Accordingly, the ALJ was required to provide clear and convincing reasons for rejecting Bridges's testimony. *Smolen*, 80 F.3d at 1281.

The ALJ provided six reasons for finding Bridges's testimony not credible. First, the ALJ found Bridges retained the ability to perform the majority of her household chores, and that capacity was inconsistent with her report that the "simplest things caused her entire body to hurt." (Tr. 16.) Second, the ALJ determined Bridges's failure to take her pain medication as prescribed impacted the credibility of her testimony as to the effectiveness of those medications in controlling her reported pain. (Tr. 16.) Third, the ALJ called into question Bridges's one-year absence from seeing

FINDINGS AND RECOMMENDATION        7        {CKH}

her treating physician, Dr. Athay, during the period of April 2006 to May 2007. (Tr. 16.) Fourth, the ALJ found Bridges's testimony about the numbness in her arms and hands inconsistent with reports from Joan Jensen, M.D. ("Dr. Jensen"), regarding Bridges's normal strength and sensory function during clinic exams. (Tr. 19.) Fifth, the ALJ found Bridges had given contradicting reasons for not pursuing mental health counseling. (Tr. 20.) Sixth, the ALJ determined Bridges's failure to report past crimes and to admit the use of methamphetamine in conjunction with her motor vehicle accidents damaged her credibility. (Tr. 16, 21.)

A.    *Daily Activities*

Bridges first argues the ALJ improperly discounted testimony regarding her daily activities because that testimony is consistent with her claims of physical limitations that restrict her ability to complete such tasks. (Pl.'s Br. 14.) Daily activities can form the basis of an adverse credibility finding where the claimant's activities: (1) contradict her other testimony or (2) meet the threshold for transferable work skills. *See Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007). If a claimant's level and type of activity is inconsistent with her claimed limitations, those activities have a bearing on her credibility. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). Moreover, sporadic performance of minimal activities is not inconsistent with disability. *Higgins v. Astrue*, CIV. 10-193-KI, 2011 WL 2135472, at *4 (D. Or. May 31, 2011) (citing *Reddick v. Chater,* 157 F.3d 715, 722–23 (9th Cir. 1998)).

Neither of the two grounds for using daily activities to support an adverse credibility determination – activities that contradict other testimony or meet the threshold of transferable skills – are present in this case. The ALJ asserted an inconsistency between Bridges's testimony that "the simplest things caused her entire body to hurt," and Bridges's claim she retained an ability to perform the majority of her household chores. (Tr. 16.) In fact, Bridges's testimony describing her contribution to the household chores does not contradict her earlier claim about pain. Bridges did not testify that she is unable to perform *any* simple task. She testified about "not being able to even do *some* of the simplest things," which is consistent with her later description of how her pain had greatly restricted her ability to perform the simple task of putting clean dishes away in the cupboard. (Tr. 33 (emphasis added)). "When I put dishes away, it's one dish at a time, and it's in my left hand. It's no more being able to take a stack of plates and stick them in the cupboard." (Tr. 45.) Moreover, the ALJ's characterization of Bridges's testimony about her capacity to perform other chores is inaccurate. She does not claim to retain the ability to perform the majority of the household responsibilities. To the contrary, in response to the ALJ's question of whether she could "handle" her house work, she testified: "[w]hat I can of it. If you saw my house, you'd know what I meant. I mean, it's not cleanest place in the world." (Tr. 44.) Bridges's testimony shows, in fact, she receives assistance with most of the housework that she still can perform. "[M]y roommate, . . . [s]he does a lot. My son also helps out." (Tr. 44.) "I always take somebody with me [when grocery shopping] – I have a friend, Richard, that helps me, or my son." (Tr. 45.) Finding no contradiction within Bridges's testimony about her daily activities, the court finds this is an improper basis for rejecting Bridges's testimony.

B.      *Use of Pain Medication*

Next, Bridges challenges the ALJ's finding that her failure to take pain medications as prescribed impacts her credibility as to the effectiveness of those medications.    Specifically, the ALJ reasoned:

> When it was pointed out to her that she repeatedly requested early refills on her prescribed medications, Ms. Bridges indicated that when she does take her medications she doubles up on them at times. Ms. Bridges admitted that this meant she did not take her medications as prescribed. Given that the reason for prescribing medications at set intervals is to provide consistent pain relief, Ms. Bridges'[s] failure to abide by the prescribed regimen negatively impacts the credibility of her testimony as to the effectiveness of the prescribed medications at controlling her overall reported pain.

(Tr. 16.)   An adverse credibility finding may be based upon an unexplained, or inadequately explained, failure to follow a prescribed course of treatment.    *Fair*, 885 F.2d at 603.   However, case law in the Ninth Circuit indicates seeking aggressive pain relief in the form of medication is a normal response to pain and suggests that such behavior makes a claimant's testimony of debilitating pain more credible, rather than less credible.    *Buckard v. Astrue*, CV 09-1073-PK, 2010 WL 5789044, at *16 (D. Or. Dec. 7, 2010) (citing *Orn*, 495 F.3d at 638), *report and recommendation adopted sub nom*, CIV. 09-1073-PK, 2011 WL 530141 (D. Or. Feb. 7, 2011).   In *Buckard*, this court treated the claimant's several requests for *increases* of her pain medication prescription when her fibromyalgia worsened as a normal response to pain.    *Id.* at *16.

Here, what the ALJ characterized as Bridges's admittance of noncompliance is more accurately described as instances in which she sought out more aggressive pain relief.   For example, Bridges was prescribed one Percocet, four times a day, but she took two pills twice a day to alleviate her pain. (Tr. 46.) "I take them daily, but the pain is bad enough that one I have found does not do,

so I take two at a time. So, I only can take them twice a day. . . . I will take four a day every day, but it's – I – but because of the way that I have to take them because I need two of them at a time." (Tr. 46.) This evidence does not undermine Bridges's credibility because it comports with acceptable behavior in response to pain. *See Buckard*, 2010 WL 5789044, at *16. In fact, Bridges increased her dosage even despite her fear of becoming addicted to pain medication. (Tr. 47.) She testified that at the end of every month her prescription was finished. (Tr. 47.) Moreover, the ALJ's reliance on the finding that prescribing medications at set intervals is intended to provide consistent pain relief is misplaced because Bridges was not informed of the potential for improving her pain management through regular use of medication. While prescribed Percocet under the care of Dr. Athay, she reported taking two pills three or four times each day, but Dr. Athay did not mention any negative impact of that practice. (Tr. 299.) The record demonstrates Bridges acted to ease her pain and there is no evidence she knowingly disregarded the advice of her doctors. The ALJ's finding that Bridges's failure to follow her prescribed medication regime is an improper basis to discredit her pain testimony.

C.    *Treatment Consistency*

Bridges also challenges the ALJ's reliance on a one-year gap in her treatment history to discredit her testimony. "Disability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." *Orn*, 495 F.3d at 638 (citation omitted). In *Orn*, the Ninth Circuit determined the claimant's failure to receive medical treatment during the period that he had no medical insurance could not support an adverse credibility finding. *Id.*

There is sufficient evidence of Bridges's economic hardship from April 4, 2006, to July 23, 2007, when she stopped seeking care from Dr. Athay, to excuse Bridges's absence from treatment

FINDINGS AND RECOMMENDATION        11                               {CKH}

during that period. Upon Bridges's return, Dr. Athay reported she was homeless and sleeping at friends' homes. (Tr. 285.) During that lapse in treatment, the record reflects Bridges saw only one medical professional, Pamela R. Joffee, Ph.D. ("Dr. Joffee"), who performed a psychodiagnostic assessment of Bridges on October 18, 2006, during which Bridges explained, "she [wa]s facing foreclosure, as she hasn't been able to make her payments since June. Her electricity was also shut off this morning and her water is due to be shut off soon." (Tr. 337.) What is more, "[s]he has no insurance." (Tr. 339.)

In support, the ALJ pointed to medical evidence in the record that Bridges's congestive heart failure, which caused her to finally seek out treatment at the end of this period, resulted from Bridges discontinuing her medication. (Tr. 16.) Contrary to the ALJ's treatment of this evidence, Bridges's discontinuance of her medication from 2006 to 2007 does not support the ALJ's adverse credibility finding. Bridges told Dr. Athay she had stopped her medicine several months before her admittance to the hospital on July 23, 2007, because she had no money with which to refill her prescriptions. (Tr. 285.) Dr. Athay reported, "[s]he just ran out and could not afford her medicine." (Tr. 285.) Thomas Lissman, M.D. ("Dr. Lissman"), who evaluated Bridges's mental health condition while she was in the hospital following her congestive heart failure, also reported, "[f]or the past month she was staying with a friend, but ran out of money and could not afford her medications. Thus, she went off all her thyroid medication, antihypertensive medications, etc." (Tr. 238.) Moreover, on March 3, 2009, Bridges still had $100,000 of unpaid hospital bills from her motor vehicle accidents in December 2005. (Tr. 517.)

The Commissioner argues Bridges had access to financial assistance for prescription refills that she did not utilize, like the Sunflower House recommended by Dr. Athay. (Def.'s Br. 8.) Dr.

FINDINGS AND RECOMMENDATION         12                           {CKH}

Athay told Bridges about Sunflower House only after he admitted her to the hospital in July 2007. (Tr. 284.) There is no evidence Bridges had knowledge of this resource when she ran out of medication in early 2007.

Finally, the ALJ erred in not referencing any evidence of Bridges's financial problems from 2006 to 2007 before relying on this gap in treatment to discredit her testimony. An "adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering . . . information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment" including inability to pay. SSR 96-7p, 1996 WL 374186, at *7-8 (July 2, 1996); *Orn*, 495 F.3d at 638. The court finds the ALJ's failure to consider evidence of Bridges's financial hardship to explain her failure to seek treatment for one year was in error. Thus, this period in Bridges's treatment history is not proper justification for an adverse credibility finding.

D.    *Mental Health Treatment*

Next, Bridges argues the ALJ improperly discredited her testimony by finding her noncompliant with her mental health treatment and inconsistent with providing reasons for not participating in mental health counseling. The ALJ found "Bridges was not only involved in polysubstance abuse, but she has failed to comply with her psychotropic medication treatment, either by not taking them altogether or by being inconsistent in taking them." (Tr. 20.) And further, "Bridges testified that she was not in counseling due to financial constraints. However . . . when given the opportunity to get mental health counseling in the past she has opted out." (Tr. 20.)

While the ALJ does not provide specific instances of Bridges's alleged noncompliance, the record shows Bridges declined medication on July 26, 2007, during an examination from Dr.

Lissman.[3] Bridges was "not interested in [anti-depression] medication and it [did] not appear to be indicated." (Tr. 241.) During this visit, however, Dr. Lissman did not diagnose Bridges as clinically depressed or even prescribe psychotropic medication. Instead, he opined "[s]he did not appear to be particularly clinically depressed to me. I think that her self-assessment that she simply is discouraged by her life's problems is probably accurate. She was not interested in treatment psychiatrically." (Tr. 241.) This instance was not a situation in which Bridges disobeyed the recommendations or direction of her treatment provider -- instead the record suggests they talked generally about treatment. Likewise, Bridges has received treatment for depression from a mental health practitioner in the past. *Cf. Burch*, 400 F.3d at 681 ("the ALJ partially discredited Burch's testimony . . . because she did not seek any treatment or evaluation. . . . At times, she has been given psychotropic medication, but she does not carry a diagnosis of depression and she has not received care from a mental health practitioner"). On the contrary, Bridges declined her psychotropic medication only when her doctor agreed she did not need to be medicated.

Moreover, the record contains significant evidence of Bridges's persistence in obtaining mental health medication even without health insurance or enough money to afford prescriptions. *See* SSR 96-7p, 1996 WL 374186, at *7 (persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, lend support to allegations of intense symptoms). According to Dr. Athay's reports on December 2, 2007, Bridges received samples of her medicine from doctors at The Corvallis Clinic (the "Clinic"). (Tr. 309.) In addition, while first receiving treatment from Michael Laurie, M.D. ("Dr. Laurie"), Bridges had a prescription for twenty

---

[3]The other record of inconsistent use of her medication on April, 29 2005, occurred before the period of alleged disability. Thus, the court considers it irrelevant to a credibility finding.

milligrams ("mg") of Celexa.[4]  (Tr. 497.)  On September 10, 2008, Dr. Laurie prescribed an increased dose (forty mg) of Celexa, at Bridges's request.  (Tr. 486.)  On January 28, 2009, she was still on forty mg of Celexa.  (Tr. 520.)  Bridges testified that at the time of the hearing she was getting "Zelixa" through the help of friends and "lots of $4.00 programs."  (Tr. 43.)

      The ALJ also failed to fully consider the substantive evidence, documented in the medical record, of Bridges's inability to afford prescription refills.  When she had her psychodiagnostic assessment on December 11, 2006, she was not taking any psychotropic medication.  (Tr. 337.)  Regarding that medication, Dr. Joffee noted, "[s]he is also discouraged that she can't take her medication regularly. . . . Bridges has no insurance, and so does not consistently take her medication."  (Tr. 338-39.)  Dr. Lissman also reported Bridges could not afford medication.  (Tr. 241.)  In contrast, the ALJ categorized such evidence as: "lack of finances during those previous time periods makes little sense in light of the fact that she was able to afford her polysubstance habit."  (Tr. 20.)  In fact, Bridges consistently reported during the hearing and to her health-care providers that she stopped taking methamphetamine in 2006, and the ALJ cited no evidence to the contrary.  (Tr. 43-44, 352, 406, 521.)  While Bridges did admit to continuing use of marijuana, the record shows that use was occasional.  (Tr. 186, 235, 240, 339.)  In light of the ALJ's failure to provide specific instances of Bridges's failure to comply with psychotropic medication she had actually been prescribed or to mention the significant evidence in the record, other than Bridges's testimony, of her inability to afford prescription refills, the ALJ's finding that Bridges was

---

    [4]Celexa (Citalopram) is used to treat depression. *Citalopram*, PUBMED HEALTH (Apr. 2, 2012), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001041/.

FINDINGS AND RECOMMENDATION     15                  {CKH}

noncompliant with her psychotropic medication treatment was an insufficient basis to discredit her testimony.

Additionally, the ALJ's finding that Bridges was inconsistent with past excuses for not participating in mental health counseling fails to provide clear and convincing evidence to reject Bridges's subjective complaints. The ALJ juxtaposed Bridges's testimony that she was not in counseling because she had "no money" with two previous decisions to "opt out" of opportunities to receive counseling. (Tr. 20.) As outlined above, the evidence in the record of Bridges's financial barriers to pursue treatment is so substantial that Bridges's hearing testimony does not conflict with the two instances she declined counseling because she reported feeling better. (Tr. 284, 286.) The record is clear Bridges could not afford a long-term treatment program like counseling during the period of alleged disability.

      *E.*     *Testimony About the Use of Her Hands and Arms*

Bridges next argues the ALJ misinterpreted Dr. Jensen's assessment of Bridges's neurological symptoms in finding her testimony about numbness in both hands to be inconsistent with Dr. Jensen's evaluation. (Pl.'s Br. 16.) Specifically, the ALJ determined Bridges's testimony that "she awoke during the night with both hands numb and that her activities were limited due to this condition . . . is inconsistent with Dr. Jensen's reports that her symptoms migrated, and during her examinations she demonstrated normal strength and sensory function." (Tr. 19.)

The record indicates Bridges continued to experience hand numbness at times throughout her treatment with Dr. Jensen although she was assessed at her appointments as having normal strength and tone. Bridges maintained her complaint about her hands turning numb throughout her treatment for extremity pain. Dr. Jensen reported, "[t]he patient is still quite concerned as to why her hands

and arms go 'dead,' such that she cannot even use them if she lies in any position for any length of time." (Tr. 518.) Dr. Jensen did not question this complaint despite having assessed Bridges's motor function as normal during a previous visit. (Tr. 522.) In fact, Dr. Jensen took Bridges's symptom seriously and ordered an MRI of Bridges's cervical spine. (Tr. 518.) The scan showed a very large protrusion at the C6-7 disc "completely blocking the right neuforamen . . . and flattening of the spinal cord posteriorly and on the right side." (Tr. 516.) Further, the MRI revealed a smaller disc at C5-6 also causing left neuroforaminal stenosis. (Tr. 517.) Upon her first review of the MRI results, Dr. Jensen opined that the findings "certainly do[] explain the patient's upper extremity and neck complaints." (Tr. 517.) Even later when Dr. Jensen questioned whether the foraminal narrowing actually was causing Bridges's symptoms, she was consistent in describing Bridges's condition as "upper extremity paresthesias."[5] (Tr. 514.)

Moreover, Bridges testified at the hearing she experienced the numbness specifically when lying down in certain positions. (Tr. 42.) Bridges described to Dr. Jensen these same circumstances as the sources of her pain: "She reports that she has been waking up with dysesthesias and paresthesisas in her arms, usually worse when she is lying down at night." (Tr. 520.) There is no evidence in the record that the strength and tone tests performed in the clinic occurred immediately after Bridges had been lying down; thus, these assessments are not clearly inconsistent with her testimony about experiencing numbness. The ALJ even acknowledged later in the opinion "objective findings in the record regarding difficulties with bilateral shoulder paresthesia and hands"

---

[5]Paresthesia is defined as "a sensation of pricking, tingling, or creeping on the skin having no objective cause and usually associated with injury or irritation of a sensory nerve or nerve root." MEDLINE PLUS MEDICAL DICTIONARY, MERRIAM-WEBSTER, http://www.merriam-webster.com/medlineplus/paresthesias (last visited Feb. 17, 2012).

before limiting Bridges's RFC accordingly. (Tr. 10.) After reviewing Bridges's testimony about her hand condition with the record as a whole, the court finds the medical evidence is consistent with Bridges's complaints of numbness and, therefore does not provide a legitimate basis for the ALJ to discount that testimony.

F.    *Methamphetamine Use and Criminal Record*

Finally, in discrediting Bridges's testimony, the ALJ also notes instances in the record when Bridges allegedly lied. In determining the credibility of testimony, the ALJ may consider a claimant's reputation for truthfulness. *Burch*, 400 F.3d at 680 (internal citation omitted). "For example, if a claimant has a reputation as a liar . . . that may be properly taken into account in determining whether or not his claim of disabling pain should be believed." *Fair*, 885 F.2d at 604 n.5.

First, the ALJ identified the inconsistency between Bridges's denial of drug use in association with her motor vehicle accidents, and the discovery of methamphetamine in her system after one accident. (Tr. 16.) The ALJ noted "[r]eview of the record of Steven Athay, M.D., shows that although methamphetamine was found in her system at the time . . . Ms. Bridges denied any use of drugs or alcohol as a causal factor in her accidents." (Tr. 16.) Also in the record, Dr. Athay reported Bridges "denie[d] any use of drugs or alcohol as causative factors" in her motor vehicle accidents, despite testing positive for methamphetamine on December 19, 2005, when she was admitted to the hospital after her second accident. (Tr. 211, 292.)

Second, the ALJ found Bridges's failure to report both her arrest for misuse of food stamps and probation for wrongful possession of marijuana damaging to her credibility. (Tr. 21.)

FINDINGS AND RECOMMENDATION        18                    {CKH}

> There are some credibility issues to the severity of the symptoms reported and discrepancies in reports or non-reports of her polysubstance abuse and legal history; she reported to one evaluating psychologist that she had an arrest for misuse of food stamps, and to another treating source that she was on probation for wrongful possession of marijuana, but failed to report both.

(Tr. 21.) Dr. Joffee reported learning from Bridges during a psychodiagnostic assessment, "Bridges was arrested in 1989 for unlawful use of food stamps and was in jail for a few hours." (Tr. 339.) On July, 26, 2007, Bridges told Dr. Lissman during a visit that, after raiding her home, police found marijuana paraphernalia, charged Bridges with possession of a controlled substance, and placed her on probation for eighteen months. (Tr. 238.) Bridges also told Dr. Athay on September 14, 2007, she was going to jail for ten days starting on September 17, because she had violated her probation. (Tr. 281.) In her application for Benefits, however, Bridges did not provide an answer to the directive to indicate her "fugitive felon/parole or probation violator status as of October 24, 2007." (Tr. 114.) At the very least, Bridges's probationary period for her controlled substances charge was relevant to this question. The record indicates Bridges's eighteen-month probation began sometime between February 2007 when the police charged her with possession, and September 2007 when Bridges told Dr. Athay she had violated her parole and would begin a jail sentence in three days.

If Bridges's probation violation resulted in ten days of jail time, she may have completed her sentence for her possession charge before October 24, 2007, making her probation irrelevant to the application for Benefits. Likewise, Dr. Athay opined Bridges "really does not recall the events" of her car accident on December 19, 2005. (Tr. 292.) Nevertheless, even assuming the ALJ properly assessed Bridges's reputation for truthfulness, that factor alone does not constitute substantial evidence. The record is replete with objective medical evidence to support Bridges's subjective pain

testimony.  Thus, these last two indicators of deception, without more, fall short of justifying an

adverse credibility finding.

### G.    Remedy for Failure to Credit Bridges's Pain Testimony

For the reasons set forth above, the court finds the ALJ failed to articulate specific, clear and

convincing reasons for the decision to exclude Bridges's pain testimony from the RFC assessment

and, therefore, the RFC assessment is not supported by substantial evidence.  *See Lingenfelter v.*

*Astrue*, 504 F.3d 1028, 1040-41 (9th Cir. 2007).  "Nor does substantial evidence support the ALJ's

five-step determination since it was based on this erroneous RFC assessment."  *Id.* at 1041.  As such,

the court must determine whether to remand for additional proceedings or remand for an award of

benefits.  Bridges argues because the ALJ failed to support the credibility finding with clear and

convincing reasons, her testimony should be credited as true.  (Pl.'s Br. 17-18.)

The court has the discretion to enter a judgment affirming, modifying, or reversing the

decision of the Commissioner, with or without remanding the cause for a rehearing.  *See* 42 U.S.C.

§ 405(g).  The Ninth Circuit has articulated factors for determining whether an immediate award of

benefits is appropriate:  (1) the ALJ has failed to provide legally sufficient reasons for rejecting such

evidence; (2) there are no outstanding issues that must be resolved before a determination of

disability can be made; and (3) it is clear from the record that the ALJ would be required to find the

claimant disabled were such evidence credited.  *Smolen*, 80 F.3d at 1292.  However, since its

decision in *Smolen*, the Ninth Circuit has determined the "crediting as true" doctrine resulting in an

award of benefits is not mandatory.  *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003);  *see*

*also Vasquez v. Astrue*, 572 F.3d 586, 593 (9th Cir. 2009) (recognizing split within the circuit on

whether the "crediting as true" rule is mandatory or discretionary but not resolving the conflict).

FINDINGS AND RECOMMENDATION        20                        {CKH}

Nevertheless, "where new proceedings would simply serve to delay the receipt of benefits and would not add to the existing findings, an award of benefits is appropriate." *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).

In this case, there are no outstanding issues for the ALJ to resolve. The record is clear that if Bridges's testimony were credited, a finding of disabled would be mandated. Specifically, at the hearing, the ALJ asked the VE about the impact, on Bridges's work ability, of restricted handling and the need to lie down. Although the ALJ later discredited these additional restrictions because they were based on Bridges's subjective testimony, the VE's responses established Bridges's disability in the event that those restrictions were credited as true. For example, the VE reported the necessity to lie down for two to four hours in an eight-hour day, as Bridges testified, would preclude her from full-time employment. (Tr. 52.) *See Lingenfelter*, 504 F.3d at 1041 (the vocational expert testified that, if an employee needed to lie down two or three times each day for up to 45 minutes, this would eliminate any of the positions described). Thus, the VE's testimony demonstrated that if Bridges's testimony about resting during the day to alleviate her pain had been credited, the ALJ would have found her disabled. Accordingly, a remand for further proceedings is unnecessary and Bridges is entitled to an immediate award of benefits.

II.    Opinions of Dr. Athay and Dr. Lamoreaux

Next, Bridges challenges the ALJ's treatment of the medical opinion of two treating physicians, Dr. Athay and Dr. Lamoreaux. Generally, more weight is ascribed to the opinion of a treating source than to the opinions of physicians who do not treat the claimant. *Holohan v. Massanari*, 246 F.3d 1195, 1201-02 (9th Cir. 2001); *Lester*, 81 F.3d at 830 (citation omitted). In addition, the regulations give more weight to the opinions of specialists concerning matters relating

to their specialty over that of nonspecialists. *See* 20 § C.F.R. 404.1527(d)(5); *Holohan*, 246 F.3d at 1202. However, the opinion of a treating physician is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability. *Tonapetyan v. Halter,* 242 F.3d 1144, 1148 (9th Cir. 2001). In fact, the ALJ may disregard the treating physician's opinion whether or not that opinion is contradicted. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989).

The ALJ may not reject the opinion of a treating physician (or examining physician) without providing clear and convincing reasons supported by substantial evidence in the record, if the treating physician's opinion is an ultimate conclusion or not contradicted by another doctor. *Lester*, 81 F.3d at 830 (citations omitted). If the opinion is contradicted by other physicians, the ALJ must explain her decision with specific, legitimate reasons based on substantial evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings. *Id.* (citation omitted).

    *A.*    *Dr. Athay*

Dr. Athay, an internist, treated Bridges at various times between April 2005 and October 2007. Dr. Athay first examined Bridges at the Good Samaritan Regional Medical Center on April 29, 2005, after Bridges had attempted suicide. (Tr. 186.) During that visit, Bridges explained she had not taken her depression or thyroid medication in the past year. (Tr. 186.) Dr. Athay prescribed Levoxyl, a thyroid medication. (Tr. 189.) Bridges was next treated by Dr. Athay on January 6, 2006, after Bridges's involvement in three motor vehicle accidents in December 2005. (Tr. 326.) Bridges came to Dr. Athay for treatment of her aortic aneurysm and "severe" hypertension, which doctors

had diagnosed during her hospitalization for her third car accident. (Tr. 326.) Dr. Athay directed Bridges both to continue taking hydrochlorothiazide and start taking Dilacor for her heart conditions. (Tr. 325.) On April 4, 2006, Dr. Athay examined Bridges shortly after another suicide attempt, after which her urine toxicology was positive for amphetamines, cocaine, and marijuana. (Tr. 314.) In his examination notes, Dr. Athay reported having a long discussion with Bridges about her illegal drug use. (Tr. 314.)

After a year without visits to the Clinic, Bridges was treated and hospitalized by Dr. Athay for congestive heart failure on July 23, 2007. (Tr. 284-85.) "She stopped her medicine several months ago. She just ran out and could not afford her medicine." (Tr. 285.) At this time, Dr. Athay recommended to Bridges that she follow up with the Sunflower House where she could access medicine and health care without insurance. (Tr. 284.) The report from the hospital examination from that same day, by Leslie A. O'Meara, M.D. ("Dr. O'Meara"), states that a review of a CT scan from 2006 showed no aortic aneurysm in Bridges's heart. (Tr. 235.) Dr. O'Meara opined Bridges's heart failure was related to her "uncontrolled hypertension over many years" and ordered an echocardiogram. (Tr. 236.) The echocardiogram "showed that she had an ejection fraction of 22%, moderate to severe regurgitation, grade 3 diastolic dysfunction and mild elevation of pulmonary artery pressure." (Tr. 233.)

On August 2, 2007, Dr. Athay evaluated Bridges following her hospitalization. (Tr. 283.) His impression was, "[s]he is now back on her medicine, and she is much better." (Tr. 283.) Dr. Athay provided Bridges with samples of her heart medicine, Coreg, high blood pressure medication, lisinopril, and her thyroid hormone, Synthroid. (Tr. 283.) On August, 16, 2007, Dr. Athay evaluated Bridges again, noted continued progress, and provided more samples of her medication. (Tr. 282.)

During that same visit, Dr. Athay reported his support for Bridges getting disability benefits. (Tr. 282.) "This lady has too many medical problems. She cannot work everyday and should be on permanent disability." (Tr. 282.) On September 14, 2007, Dr. Athay saw Bridges and reported, "medically, she is stable." (Tr. 281.) At that visit, Dr. Athay gave Bridges a slip stating she needed to take her medicine while serving her ten-day jail sentence for a probation violation, and provided more samples of her prescriptions. (Tr. 281.) Again on October 22, 2007, Dr. Athay described Bridges as medically stable and provided her with enough sample medications to last her a month. (Tr. 278-79.)

There is no record of Bridges visiting Dr. Athay after October 2007. On May 29, 2008, however, Dr. Athay responded to a request for information from Bridges's attorney with his opinion that Bridges was totally disabled and unable to engage in full-time employment. (Tr. 526.)

> She currently is under medical treatment for congestive heart failure and hypothyroidism and hypertension. She also has chronic asthma and depression. The patient is not able to sustain gainful employment at this time. She would not be able to work an 8-hour a day, 5 days a week, on a sustained basis. This patient is quite limited as to what she can do. She gets short of breath with exertion. She has to rest frequently. I believe because of her severe congestive heart failure along with her psychiatric problems, depression, hypothyroidism, hypertension, and other problems that she is not able to seek gainful employment. I believe this is on a permanent basis and will not change.

(Tr. 526.)

Dr. Laurie, also an internist, treated Bridges more recently – from February 2008 to March 2009. Bridges's treatment history with Dr. Laurie began on February 28, 2008, when Bridges sought relief for pain in her neck, low back, shoulder, elbows, knees, and hips. (Tr. 498.) Dr. Laurie prescribed Percocet, which "[s]he was given" during that visit. (Tr. 499.) Dr. Laurie noted Bridges did not report having chest pain or shortness of breath. (Tr. 499.) Bridges told Dr. Laurie she was

not abusing illicit drugs, but was still smoking cigarettes and knew she should stop. (Tr. 499.) On April 10, 2008, Dr. Laurie again noted "[n]o complaints of chest pain or shortness of breath." (Tr. 497.) On May 8, 2008, Bridges also told Dr. Laurie she had no chest pain or difficulty breathing, and Dr. Laurie concluded Bridges's cardiomyopathy "seems to be resolved," after a repeat echocardiogram showed normal left ventricular function. (Tr. 492, 494, 495.) Bridges did present symptoms of fatigue, which Dr. Laurie opined might be caused by the "beta blocker" she was taking. (Tr. 495.) This visit occurred after Bridges had been discharged from the hospital following an asthmatic episode. (Tr. 494.) Bridges told Dr. Laurie she had stopped smoking cigarettes. (Tr. 492.) On June 30, 2008, Dr. Laurie reported again Bridges had no signs of congestive heart failure and her cardiomyopathy was "currently doing well." (Tr. 489.) Bridges complained of experiencing daytime somnolence and "not sleeping well." (Tr. 489.) Dr. Laurie assessed these reports as possibly caused by sleep apnea but ordered an overnight oximetry to measure the level of oxygen in her hemoglobin while she slept. (Tr. 489.)

On September 10, 2008, Dr. Laurie reviewed with Bridges the "unremarkable" results on her overnight oximetry. (Tr. 486.) At that same visit, Bridges told Dr. Laurie she thought her chronic pain tended to wake her up during the night. (Tr. 486.) On September 29, 2008, Dr. Laurie saw Bridges for a cough. On November 5, 2008, Bridges still had a cough and sore throat. (Tr. 481.) She also complained for mild shortness of breath when lying down. (Tr. 480-81.) Dr. Laurie concluded she had "mild reactive airway disease manifested by cough causing her shortness of breath," noting her pulse oximeter was "unremarkable at 99%." (Tr. 481.) On December 31, 2008, Dr. Laurie also treated Bridges for sore throat and fever. (Tr. 478.) After Dr. Laurie's last

interaction with Bridges on March 25, 2009, he reported she presented no signs of congestive heart failure. (Tr. 477.)

The ALJ questioned Dr. Athay's opinion in four important respects. First, the ALJ gave more weight to Dr. Laurie's ultimate opinion that Bridges's heart condition was stable. (Tr. 20.) Second, the ALJ concluded Dr. Athay's ultimate opinion that Bridges was disabled was inconsistent with his own reports that Bridges was medically stable during her visit on October 22, 2007. (Tr. 20.) Third, the ALJ noted Dr. Athay's failure to attribute symptoms of Bridges's heart condition to instances when she was noncompliant with her heart medication. (Tr. 20.) Fourth, the ALJ questioned the legitimacy of Dr. Athay's recommendation because he did not note that Bridges's use of methamphetamine and marijuana impacted her symptoms of asthma and depression. (Tr. 20.)

Bridges maintains the ALJ provided unconvincing reasons for rejecting Dr. Athay's opinion that Bridges was "totally disabled and not able to engage in full-time employment." (Tr. 526.) The Commissioner contends Dr. Athay's opinion is contradicted by Dr. Laurie, who treated Bridges more recently. (Def.'s Br. 14.)   Bridges first argues Dr. Laurie's conclusions – that Bridges's "cardiovascular status seems to be stabilized" and "it is not clear . . . that the patient cannot work at this time" – are too vague to merit significant weight. (Reply 6.) Second, Bridges challenges the ALJ's conclusion that Dr. Athay's ultimate opinion about Bridges's disability was inconsistent with his own reports of Bridges's medical stability on the basis that an assessment of stability is not determinative of improved function. (Reply 6.) Third, Bridges argues the ALJ's reliance on Dr. Athay's failure to mention Bridges's noncompliance in taking her heart and thyroid medication is improper because Bridges's discontinuation of her medication resulted from an inability to afford refilling her medication. (Pl.'s Br. 18-19.) Fourth, Bridges contends the ALJ improperly relied on

FINDINGS AND RECOMMENDATION      26                        {CKH}

Dr. Athay's failure to indicate the connection between Bridges's history of illegal drug use and her mental conditions. (Pl.'s Br. 19.)

The court finds the ALJ gave clear and convincing reasons for concluding Dr. Athay's opinion about Bridges's disability was entitled to only minimal weight. First, the ALJ's adoption of Dr. Laurie's opinion as to the stability of Bridges's heart condition is convincing because Dr. Athay and Dr. Laurie consistently reported Bridges's improvement since her congestive heart failure in 2007. Specifically, the ALJ found Dr. Athay's conclusions to contradict the opinion of Dr. Laurie, who did not endorse a disability determination and instead concluded Bridges's "cardiovascular status seems to be stabilized" on May 6, 2009. (Tr. 531.) Dr. Laurie provided this opinion approximately one year after Dr. Athay wrote to Bridges's attorney that Bridges was totally disabled on May 29, 2008. Dr. Athay's last visit with Bridges on record was on October 2007 and during the period after Dr. Athay's letter only Dr. Laurie served as Bridges's internist. As such, after treating Bridges for a year longer than Dr. Athay, Dr. Laurie's opinion reflected the most current state of Bridges's condition. A treating physician's most recent medical reports are highly probative. *Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001). Bridges argues the vagueness of Dr. Laurie's conclusion diminishes the authority of his opinion. (Reply 6.) The court finds the choice of words or phrasing in Dr. Laurie's ultimate opinion does not detract from the substantial record of Bridges's increasing stability from 2007 to 2009.

As for Bridges's second contention, the court finds the ALJ's reliance on the substantial medical evidence of Bridges's stability when on her medication to be a legitimate reason for minimizing Dr. Athay's conclusion. Specifically, the ALJ noted Dr. Athay's failure to mention how Bridges's depression, asthma, hypertension, and thyroid condition were stable as long as Bridges was

compliant with her prescription plan undermined his opinion. (Tr. 20.) Here, since July 23, 2007, when Bridges resumed taking her thyroid and heart medication consistently, she seldom complained of fatigue and only once of mild shortness of breath. (Tr. 480, 492, 497, 499.) Even so, Dr. Laurie attributed the symptoms in each of those complaints to causes other than her heart disease – mostly sleep apnea for her fatigue and reactive airway disease for her shortness of breath. (Tr. 480, 489.) While still under the care of Dr. Athay and after being hospitalized for congestive heart failure, Bridges showed only signs of improvement. On at least three of these occasions, Dr. Athay reported Bridges was medically stable. (Tr. 279, 281, 282.) Additionally, Dr. Athay acknowledged Bridges's recovery was a result of her medication: "She is now back on her medicine, and she is much better." (Tr. 283.)

As such, even though the record shows that when not taking her medication Bridges is prone to congestive heart failure, Bridges did not regularly present the symptoms of shortness of breath or fatigue that Dr. Athay concluded would prohibit Bridges from participating in full-time employment. In fact, other than the events that resulted in her hospitalization for congestive heart failure in 2007, she managed to take her heart prescriptions consistently during the time period in which she is claiming disability and her symptoms stayed under control. *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (generally, impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for Benefits). A determination that a claimant is entitled to receive Benefits when the claimant's impairment is not presently disabling, but merely for the purpose of making medication affordable in order to prevent the impairment from becoming disabling, is not an appropriate decision for the judiciary. *Id.* ("[T]here is no statutory, regulatory, or judicial authority to support the rule that the dissent urges

FINDINGS AND RECOMMENDATION        28                                {CKH}

us to adopt, namely, that disability benefits may not be discontinued if the claimant cannot afford treatment without them.")

The court finds the record does not support Bridges's third assertion, that an assessment of stability is not determinative of improved function. (Tr. 20.) Dr. Athay specifically attributed his conclusion about Bridges's restricted function to her symptoms of "shortness of breath with exertion" and her need "to rest frequently." (Tr. 526.) The citations to the record above demonstrate that as Bridges's heart condition stabilized during late 2007 through 2009, her complaints about shortness of breath and fatigue diminished. And when she did report these symptoms to Dr. Laurie, it was in conjunction with ailments other than her heart condition. The court finds there is substantial evidence in the record to show Bridges's cardiovascular stability did improve her functioning.

Fourth, Bridges contends the ALJ improperly found Dr. Athay's opinion to be less credible because he did not note Bridges's use of methamphetamine and marijuana impacted her symptoms of asthma and depression. (Pl.'s Br. 19.) The court agrees. The ALJ provided no citation to the record or reference to specific medical opinions to support the conclusion that Bridges's use of illicit drugs created either of these ailments. During her treatment for asthma in 2008, Dr. Laurie did not indicate in his clinic notes that marijuana irritated her asthmatic symptoms. (Tr. 492-99.) His notes only mention Bridges's use of tobacco. (Tr. 492, 499.) Moreover, Bridges's treatment providers continued to prescribe Celexa for Bridges's depression in 2008 and early 2009, long after she had discontinued use of methamphetamine and cocaine in 2006. (Tr. 486, 497, 520.) Nevertheless, the court finds the ALJ's remaining three reasons clear and convincing for justifying the elevation of Dr. Laurie's opinion over the conclusions of Dr. Athay. After a careful review of the record as a whole,

FINDINGS AND RECOMMENDATION        29                          {CKH}

the court is satisfied the ALJ provided clear and convincing reasons, supported by substantial evidence in the record, for the minimal consideration of Dr. Athay's opinion.

B.    *Dr. Lamoreaux*

Dr. Lamoreaux's first involvement in Bridges's care on record occurred on October 28, 2008, when she ordered an X-ray of Bridges's right shoulder. (Tr. 467.) Dr. Lamoreaux then ordered an ultrasound on December 10, 2008, and an MRI on January 13, 2009, of Bridges's same shoulder. (Tr. 466-67.) Dr. Lamoreaux saw Bridges again on March 17, 2009, when Bridges complained of being unable to "feel her shoulder." (Tr. 465.) Although Dr. Lamoreaux reported Bridges's physical therapy as helping her shoulder pain, Dr. Lamoreaux advised Bridges to discontinue physical therapy noting, "it is not indicated this time." (Tr. 465.) Instead, Dr. Lamoreaux noted, "the recommendation is obviously for surgical intervention at this time." (Tr. 465.) Dr. Lamoreaux concluded in her notes that she "concur[red] with Dr. Jensen and would support [Bridges's] application for disability, as this is something that needs to be addressed and she certainly cannot work with it as it is." (Tr. 465.) There are no other notes in the records from Dr. Lamoreaux, but Dr. Lamoreaux's introductory note on March 17, "I am seeing Regena back today," suggests Dr. Lamoreaux had seen Bridges for treatment before that day. (Tr. 464.) On March 26, 2009, Dr. Lamoreaux wrote to Bridges's attorney: "It is my medical opinion that Ms. Bridges is currently not able to work in any significant capacity. The medical basis is a large herniated cervical disc which is causing her upper extremity radiculopathy." (Tr. 511.)

Bridges maintains the ALJ improperly discounted Dr. Lamoreaux's opinion that Bridges was "currently not able to work in any significant capacity" on the ground that the opinion was supported, not contradicted, by Dr. Jensen's medical conclusions. (Tr. 511.) Bridges argues the two opinions

FINDINGS AND RECOMMENDATION        30                    {CKH}

were consistent regarding Bridges's symptoms of shoulder pain and paresthias, and Dr. Jensen's

decision to not endorse Bridges's application for disability did not constitute a contradiction. (Pl.'s

Br. 20.)

On a preliminary matter, the court finds Dr. Lamoreaux to be a "treating physician" as

defined by 20 C.F.R. § 404.1502. The Commissioner asserts Dr. Lamoreaux's opinion is not entitled

to the same weight as a treating physician because Dr. Lamoreaux examined Bridges on only one

occasion. A treating source is defined as a physician, psychologist, or other acceptable medical

source who provides the claimant, or has provided the claimant, with medical treatment or evaluation

and who has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502;

*see also Benton ex rel. Benton v. Barnhart (Barnhart)*, 331 F.3d 1030, 1038 (9th Cir. 2003) (citation

omitted). "There is no bright line for determining when a relationship between a claimant and

physician is a treating one – a single visit may suffice." *Id.* "Rather, the relationship is better viewed

as a series of points on a continuum reflecting the duration of the treatment relationship and the

frequency and nature of the contact." *Id.* (quoting *Ratto v. Sec'y, Dep't of Health & Human Servs.*,

839 F. Supp. 1415, 1425 (D. Or. 1993)).

In *Barnhart*, the Ninth Circuit found a doctor who had seen the claimant only one time to

qualify as a treating source, even though he "may be placed relatively low on the continuum of

treating physicians." *Barnhart*, 331 F.3d at 1038. The court determined the doctor's opinion was

entitled to greater weight than that of an examining physician, in part, because he was employed to

cure the claimant. *Barnhart*, 331 F.3d at 1039-40 (citing *Ratto*, 839 F. Supp. at 1425 (the opinion

of a physician who has treated the patient for an extended period of time is usually entitled to greater

weight than a physician who has only examined the patient for SSA purposes, because the treating physician is employed to cure)).

Here, although the number of interactions between Dr. Lamoreaux and Bridges is ambiguous, the record shows Dr. Lamoreaux advised Bridges on treatment options, such as terminating physical therapy and pursuing surgery. (Tr. 464.) Dr. Lamoreaux's reports of Bridges's shoulder pain complaints during the examination on March 17, 2009, indicate Bridges was seeking treatment for her shoulder condition. (Tr. 464-65.) The Ninth Circuit has acknowledged that one key issue in determining whether a doctor was a claimant's treating physician is whether the doctor's examinations of the claimant were prompted by her need for treatment. *Barnhart*, 331 F.3d at 1038 (quoting *Bowman v. Comm'r, Soc. Sec. Admin.*, CIV. 99-1311-JO, 2001 WL 215790, at *4 (D. Or. Feb. 23, 2001)). Moreover, the ALJ referred to Dr. Lamoreaux as "treating" Bridges for her right shoulder pain. (Tr. 17.) Dr. Lamoreaux's opinion is entitled to greater weight than that of an examining or reviewing physician.

The court need not decide whether Dr. Lamoreaux and Dr. Jensen contradicted each other because their opinions about Bridges's disability were ultimate conclusions, which, similar to the uncontradicted opinions of treating physicians, the ALJ cannot reject without clear and convincing reasons. "[T]he ultimate conclusions of [treating] physicians must be given substantial weight; they cannot be disregarded unless clear and convincing reasons for doing so exist and are set forth in proper detail." *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

After comparing the opinions of Dr. Lamoreaux and Dr. Jensen, the court is satisfied the ALJ provided clear and convincing reasons for minimizing Dr. Lamoreaux's opinion. "If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because

it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. 20 C.F.R. § 404.1527(d)(2)(i)-(ii); *see also Orn*, 495 F.3d at 631. "Additional factors relevant to evaluating any medical opinion . . . include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; and the specialty of the physician providing the opinion." *Orn,* 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(3)-(6)).

In addition to finding Dr. Lamoreaux's conclusion about Bridges disability to be contradicted, the ALJ gave three additional reasons for not adopting the doctor's ultimate opinion. First, the ALJ noted Dr. Lamoreaux treated Bridges primarily for her shoulder symptoms, not her spinal condition; therefore Dr. Lamoreaux based her conclusions on assessments performed by Dr. Jensen and not on her own evaluation of Bridges's herniated cervical disc. (Tr. 18.) Dr. Lamoreaux only treated Bridges's shoulder pain with orthopedic options, like physical therapy, based on an MRI and ultrasound of Bridges's shoulder, not of her spine. (Tr. 466-67.)

Second, the ALJ indicated medical evidence in the record contrary to Dr. Lamoreaux's conclusion that Bridges's herniated disc created upper extremity radiculopathy. (Tr. 18.) Dr. Lamoreaux based her ultimate conclusion about Bridges's ability to work on Dr. Jensen's assessment that a large herniated cervical disc was causing her upper extremity radiculopathy. (Tr. 511.) Dr. Jensen's more recent opinion on the matter, recorded on April 7, 2009, after Dr. Lamoreaux's endorsement of Bridges's application for Benefits, was inconclusive about the cause of Bridges's

FINDINGS AND RECOMMENDATION        33                    {CKH}

upper extremity pain. She wrote: "I have not been certain if [the herniated disc] is causing her upper extremity symptoms but I feel because of the cord flattening this is something that should be followed clinically." (Tr. 514.)  The ALJ also pointed to Dr. Jensen's report of Bridges displaying normal tone, bulk, and power during the motor examinations on January 28, and April 7. (Tr. 515, 522.)  Bridges was referred to Dr. Jensen in neurology clinic at PeaceHealth Medical Group by Dr. Laurie to determine whether Bridges's hand numbness was caused by a neurological condition. (Tr. 484.)  An opinion regarding the neurological effect of Bridges's herniated disc, therefore, fell under Dr. Jensen's specialty and not Dr. Lamoreaux's practice, which was orthopedic surgery. Thus, with respect to Bridges's herniated disc impacting her ability to work, Dr. Jensen's opinion is entitled to greater weight.

Additionally, the ALJ noted medical evidence within Dr. Lamoreaux's own clinical notes undermined her ultimate conclusion. (Tr. 18.) On March 17, 2009, Dr. Lamoreaux indicated the therapist reported physical therapy alleviated Bridges's shoulder pain. (Tr. 474.) Despite that report, but without explanation, Dr. Lamoreaux concluded Bridges should discontinue physical therapy and pursue surgical solutions. (Tr. 474.)

Moreover, during the period of January to March 2009, when Bridges received treatment from Dr. Lamoreaux and Dr. Jensen, she visited Dr. Jensen four times. Bridges saw Dr. Jensen initially on January 28, and then again on February 10, March 3, and April 7. (Tr. 514-523.) In contrast, the record contains notes from one visit to Dr. Lamoreaux on March 17, 2009, and some indication that the visit on March 17 might have followed a previous interaction. (Tr. 464.) Bridges's treatment history was more consistent and frequent with Dr. Jensen than with Dr. Lamoreaux, and focused specifically on treating Bridges's herniated disc. For these reasons, the

FINDINGS AND RECOMMENDATION        34                        {CKH}

court finds the ALJ provided clear and convincing reasons for minimizing the opinion of Dr. Lamoreaux.

III.   Hypothetical

Finally, Bridges argues the ALJ failed to include in the RFC analysis Bridges's moderate limitations in social functioning and in concentration, persistent, or pace. (Pl.'s Br. 21.) The ALJ made both these findings based on Dr. Joffee's assessment in 2006. (Tr. 15.) Bridges contends the RFC should include a limitation to avoid interaction with supervisors and contact with coworkers because of Bridges's moderate difficulties in social situations.

Hypothetical questions posed to a VE must set out all the limitations and restrictions of the particular claimant, including pain and an inability to engage in certain activities. *Embrey*, 849 F.2d at 422. Otherwise, the VE's opinion regarding work capabilities "has no evidentiary value." *Bain v. Astrue*, 319 F. App'x 543, 545 (9th Cir. 2009). However, the ALJ must include in the hypothetical posed to a vocational expert only those limitations supported by substantial evidence. *Robbins*, 466 F.3d at 886 (citing *Osenbrock*, 240 F.3d at 1163-65).

The Commissioner argues Bridges conflates the ALJ's assessment of the severity of her impairment at step three with the RFC analysis at step five. The ALJ's two determinations above about Bridges's mental limitations were identified as part of the "paragraph B" analysis, not the RFC assessment, as the ALJ noted. (Tr. 15.)

> The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

SSR 96–8p, 1996 WL 374184, at *4 (July 2, 1996). Here, the ALJ treated Bridges's limitations in social functioning as unique to the step three analysis. For that reason and the lack of substantial evidence showing Bridges's impairment required her to be secluded from coworkers, the ALJ need not have indicated such a limitation in the RFC. In fact, the ALJ cites contrary evidence from Dr. Joffee's record: "no current interpersonal difficulties or inability to get along with others." (Tr. 14, 341.)

The ALJ does, however, incorporate the step three determination about Bridges's ability to concentrate, persist, and pace into the RFC. "[A] moderate difficulty has been assessed in this category, and Ms. Bridges has been limited to unskilled work in the residual functional capacity." (Tr. 15.) But, the ALJ did not commit error by carrying over this determination to step five. Moderate limitations in the ability to maintain attention, concentration, persistence, or pace over extended periods of time are compatible with the ability to perform unskilled jobs involving simple tasks. *Thomas*, 278 F.3d at 958; *see also Stubbs–Danielson v. Astrue,* 539 F.3d 1169, 1174 (9th Cir. 2008) (ALJ translated claimant's condition, including pace and mental limitations, into the capability to perform "simple tasks"). It was consistent with Ninth Circuit precedent for the ALJ to limit Bridges to unskilled labor as accommodation for her moderate limitations in concentration, persistence, and pace.

*Recommendation*

The ALJ failed to provide specific, clear and convincing reason for discrediting Bridges's pain testimony. In addition, because the VE gave testimony dispositive of Bridges's disability based on her need to rest during an eight-hour work day, there are no outstanding issues to resolve and the record is clear Bridges would be disabled had the ALJ credited her testimony.

FINDINGS AND RECOMMENDATION        36                    {CKH}

Based on the foregoing, the ALJ's decision that Bridges was not disabled and is not entitled to Benefits was not supported by substantial evidence. The Commissioner's decision should be REVERSED and REMANDED for an award of benefits.

*Scheduling Order*

The Findings and Recommendation will be referred to an United States District Judge for review. Objections, if any, are due June 20, 2012. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within fourteen days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 5th day of June 2012.

JOHN V. ACOSTA
United States Magistrate Judge